UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

   -against-                                                 8:07-CR-510
                                                                             (LEK)

FEKRIE BERIHUM AYALEW,

               Defendant.

**MEMORANDUM-DECISION AND ORDER**[1]

      Defendant Fekrie Berihum Ayalew ("Defendant" or "Ayalew") is accused of re-entry of a previously removed and deported alien in violation of 8 U.S.C. § 1326(a)(1) and (b)(2) and misdemeanor illegal re-entry in violation of 8 U.S.C. § 1325(a)(1). Superseding Indictment (Dkt. No. 12). On April 24 and 29, 2008, an evidentiary hearing was held to determine whether the evidence seized from the Defendant and statements made by him on November 5 and 6, 2007 must be suppressed.

**I.    Background**

      The only way to legally enter the United States in Franklin County, New York is through one of three ports of entry, where citizens, resident aliens, and foreigners are inspected for immigration and customs purposes. Daniels Test. at 5-7 (Dkt. No. 22). The territory between the ports of entry in that area is monitored by routine patrol and through the use of sensors. Id. at 7-8. The sensors--seismic, infrared, and metallic--indicate when a person is leaving or coming into

---

[1] For printed publication by the Federal Reporters.

1

the United States. Id. at 8. On November 5, 2007, at approximately 3:45pm, Border Patrol Agent Chris Daniels ("Daniels" or "Agent Daniels") responded to a sensor alert in the vicinity of Flynn's Line in Franklin County. Id. at 14-15. The sensor alert indicated that a person was traveling south and entering the United States from Canada. Id. at 15. The sensors triggered were infrared and seismic. Id. at 38. The sensors are placed and coordinated so that the agents can tell when there is a "good activation" as opposed to a single sensor, which "can be set off by something other than somebody walking." Id. at 40. Agent Daniels did not see any hunters along the area of the path on that day. Id. at 43.

When Agent Daniels arrived at Flynn's Line, he spotted the Defendant walking southbound with a small bag and a camera. Id. at 15-16. The Defendant's location was consistent with having triggered the sensors. Id. at 61. Daniels asked the Defendant where he was from, and Ayalew replied that he was from Michigan and that he was walking around because his girlfriend kicked him out of the car during an argument. Id. at 17. Ayalew then asked Daniels if he had committed a crime and Daniels indicated that when Ayalew passed a white house on the border, he had entered the United States illegally. Id. at 17, 63. Ayalew then asked Daniels how a person would know where the border is when walking around and they discussed how the border was marked. Id. at 17-18. Ayalew said he was walking around taking pictures. Id. at 18.

The area around Flynn's Line is not heavily populated. Id. at 19. There are only five houses on Flynn's Line, and the white house on the border is vacant. Id. at 19-20. Agent Daniels is familiar with the local residents, but did not recognize Ayalew. Id. at 19. Agent Daniels

worried that there might be another person around, and figured "it was either narcotic related, ... contraband smuggling, or maybe even some sort of terrorist operation." Id. at 20. Agent Daniels was concerned for his safety and that there may have been other people out in the woods. Id. at 49. Agent Daniels then did a pat down of Ayalew, took his bag and camera, and had Ayalew sit in the front of the vehicle. Id. at 51. He called for assistance, and Agents Torres and Andrews responded. Id. at 20. They also looked for a Michigan-plated vehicle in response to Ayalew's explanation that his girlfriend had dropped him off. Id. at 67; Tatro Test. at 31 (Dkt. No. 24).

**A.     Background check and arrest**

Upon request, Ayalew produced a Michigan driver's license, which Daniels used to initiate a routine background check by radio. Daniels Test. at 19 (Dkt. No. 22). When the other agents arrived, Daniels went towards the location of the sensors to attempt to locate a footprint. Id. at 21. Daniels noticed a few places "where the ground was soft and in the mud, it looked like the leaves were indented," but he was unable to locate a clear footprint. Id. at 50. Upon his return, he learned that the records check revealed that Ayalew was an Ethiopian citizen and had been ordered deported from the United States. Id. at 22-23. Daniels arrested Ayalew and transported him back to the station. Id. at 24. As Agent Daniels was preparing to leave the area with Ayalew, Agent Tatro arrived. Id. at 24.

**B.     Processing and Miranda**

Back at the Burke Border Patrol Station, during routine processing, when Agent Daniels asked Ayalew what his address had been in Canada, Ayalew replied that he would talk about everything but not about Canada or the United States. Id. at 28. Toward the end of the

processing, Agent Daniels gave Ayalew an I-214 form listing the Miranda rights to read. Id. at 29, 31. Ayalew read the form and indicated that he understood it. Id. at 29-30. Following Ayalew's reading of the Miranda warnings, Agent Daniels had a conversation with Ayalew about football and then about general facts about Ethiopia. Id. at 32. During that conversation, Ayalew told Agent Daniels that he did not know anything about Ethiopia, that he was eight years old when he entered the United States, and that he would rather stay in jail in the United States than go back to Ethiopia. Id.

**C.     Tracking and search of the camera**

Lead Border Patrol Agent Patrick Tatro ("Tatro" or "Agent Tatro"), an agent with twenty-nine and a half years experience, including specialized tracking training, also testified at the suppression hearing. Tatro Test. at 3, 6 (Dkt. No. 24). He heard the call regarding the sensor alert and explained that while "[o]ne [sensor] may be just an animal," "[t]wo sensors and the time frame in between is a good indication that a person is walking in a certain direction." Id. at 7. Agent Tatro arrived approximately 20 minutes after the alert, when Ayalew's background check results had already come in, and Ayalew was already under arrest. Id. at 8, 31. He asked Agent Daniels if he had tracked Ayalew back to the border, but Daniels stated that all he saw were disturbed leaves. Id. at 9. Agent Tatro then said he was going to track farther than Daniels went -- "further back into Canada." Id. He examined the pattern on the bottom of Ayalew's shoe and examined the trail into Canada, where he found a footprint that he believed was made by Ayalew's shoe. Id. at 9-11. Agent Tatro used another agent's digital camera to take pictures of the footprint. Id. at 11-12. Agent Tatro explained that the initial arrest was administrative and

4

that the tracking was in support of the investigation of the criminal charge. Id. at 26-27.

Back at the station, Agent Tatro examined the photos of the footprint on a computer. Id. at 13. At that time, Agent Daniels alerted Agent Tatro to Ayalew's camera, which Agent Tatro plugged into the computer as well. Id. at 13, 15. Agent Tatro testified that he looked at the pictures to see "what pictures were on there, to see if there was any evidence" and "[t]o see if the camera contained evidence of a crime being committed." Id. at 15, 17-18. He looked at all of the pictures on the camera. Id. at 15.

### D.     Miranda Warnings

After looking at the pictures, Agent Tatro asked Agent Daniels if he had advised Ayalew of his Miranda rights. Id. at 18. Daniels said that Ayalew had been advised of his rights, had read the I-214 Miranda form, and had invoked the right of a lawyer. Id. at 18-19. Agent Tatro then read Ayalew the I-214 rights "line by line to make sure that it was clear that he understood his rights" because he had not signed the form. Id. at 19. Ayalew stated that he wanted a lawyer and wanted to remain silent. Id. at 22.

The following day, Agent Tatro transported Ayalew to the Magistrate Judge's office in Plattsburgh. Id. at 23. Agent Tatro testified that during the transport, as well as "the night before at the station," Ayalew stated, while shuffling his feet, that he couldn't believe they arrested him "for crossing that magic line." Id. at 24. When made during the transport, this comment followed Tatro's explanation to Ayalew of "what was going on, the purpose of the trip, where [they] were going." Id at 24-25. Other conversations along the 55 minute trip included a discussion of what Border Patrol is looking for ("looking for terrorists and or drugs or contraband

crossing the border"). Tatro also told Ayalew that the records check had indicated that Ayalew was ordered removed and added, "that's what you want a lawyer to -- if you fear for your life, going back to your country, you have a lawyer to represent you." Id. at 26-27. Although the timing is somewhat unclear, it seems that the discussion of what Border Patrol is looking for was followed by the "shuffling experience" and the statement by Ayalew that "he didn't know why we had arrested him for crossing that magic line." Id. at 29. The testimony suggests that after Tatro described what Border Patrol is looking for -- terrorists/drugs/contraband crossing the border -- Ayalew "said he's not a terrorist or druggie" and Tatro asked him if he could describe a terrorist, because Agent Tatro said that he could not. Id. at 29.

Following the "shuffling deal," Agent Tatro told Ayalew that he had invoked the right of a lawyer and to not ask Tatro questions about the case. Id. at 30. Ayalew asked questions about his deportation case, and Tatro told him that he can have a lawyer to represent him and explained that Ayalew was ordered removed. Id. at 30.

**II.     Discussion**

The Defendant argues that his arrest near the border was an illegal seizure because Agent Daniels lacked probable cause to arrest him, and that therefore the statements made by Ayalew must be suppressed along with the physical evidence, consisting of Ayalew's backpack, camera and its contents, and his shoe.

A.     Stop and arrest of Ayalew near border

    1.     Standard of Law for Probable Cause

A warrantless arrest of an individual is consistent with the Fourth Amendment if the

arrest is supported by probable cause. Maryland v. Pringle, 540 U.S. 366, 370 (2003) (quoted by U.S. v. Baldwin, 496 F.3d 215, 220 (2d Cir. 2007)).  "Probable cause is 'a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules.'"  Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir. 2007) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)).  Probable cause "requires only such facts as make wrongdoing or the discovery of evidence thereof probable."  Id. at 157.

"Probable cause is not a particularly demanding standard."  United States v. Solomonyan, 452 F. Supp. 2d 334, 343 (S.D.N.Y. 2006).  Probable cause merely "requires an officer to have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (internal citations omitted).  Probable cause is determined by looking at what facts the officer had available at the time of, and immediately prior to, arrest.  Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002).

    2.    Agent Daniels' Information

Before Agent Daniels encountered Ayalew, he was informed of a sensor alert indicating that something or someone had crossed the border and was moving southbound along Flynn's Line.  Upon responding to the alert, he saw Ayalew walking south away from the location of the sensors in a sparsely populated area, and did not recognize Ayalew as one of the local residents.  No hunters or other vehicles were seen in the area.  Agent Daniels asked Ayalew background questions, and when he became concerned for his safety, patted him down and initiated a background check.  When, in response to Ayalew's question, Agent Daniels explained that

7

Ayalew committed a crime when he passed a white house located on the border, Ayalew did not deny passing the house but responded by asking how a person would know where the border was. When backup agents arrived, Agent Daniels went towards the location of the sensors to attempt to locate a footprint, and noticed a few places where the leaves were "indented" suggesting that a person had recently walked through that area, although he was unable to locate a clear footprint. Upon his return to the area of the arrest, he learned that the records check revealed that Ayalew was an Ethiopian citizen and had been ordered deported from the United States. Knowing that it would have been illegal for any person, whether United States citizen or alien, to cross the border in that area, Agent Daniels had enough facts to "as make wrongdoing or the discovery of evidence thereof probable." Walczyk v. Rio, 496 F.3d at 157. Accordingly, he had sufficient probable cause to arrest Ayalew.

B.   Statements made to Agent Daniels

   1.   Pre-arrest statements

Prior to the arrest, Ayalew made several statements to Agent Daniels regarding, *inter alia*, why he was in the area and where he had come from. The failure of law enforcement officials to administer Miranda warnings prior to questioning a person who is in custody is a violation of a suspect's rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 444 (1966). However, a suspect is not in custody just because he is being questioned by a law enforcement officer. Oregon v. Mathiason, 429 U.S. 492, 295 (1977).

Immigration rules and regulations permit border questioning as a routine and necessary predicate to enforcement of immigration laws. United States v. Silva, 715 F.2d 43, 47 (2d Cir.

1983); United States v. Moody, 649 F.2d 124, 127 (2d Cir. 1981).  During the inspection process, authorities may ask questions regarding admissibility of both the person and his effects.  Silva, 715 F.2d at 47 n. 7.  However, Miranda warnings are not necessary during the context of routine border inquiries.  Silva, 715 F.2d at 46; Moody, 649 F.2d at 127.

Any statements that Ayalew made to Agent Daniels prior to his arrest were made in response to questioning that was part of a routine border inspection.  Accordingly, that questioning and the resulting statements did not violate the requirements of Miranda or the Fifth Amendment, and the Defendant's Motion to suppress those statements is denied.

      2.      Post-arrest statements to Agent Daniels

During processing, Ayalew indicated that he would not speak to Agent Daniels regarding Canada or the United States.  Toward the end of the processing, Ayalew was informed of his Miranda rights.  Agent Daniels then had a conversation with Ayalew about football and about general facts about Ethiopia, during which Ayalew told Agent Daniels that he did not know anything about Ethiopia, that he was eight years old when he entered the United States, and that he would rather stay in jail in the United States than go back to Ethiopia.

Interrogation requires express questioning or its functional equivalent, and includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  United States v. Miller, 382 F. Supp. 2d 350, 370 (N.D.N.Y. 2005) (citing Rhode Island v. Innis, 445 U.S. 291, 300-02 (1980) ("since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation

9

can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.") (emphasis in original)).

The offense in this case involved the crossing of the border between the United States and Canada. Agent Daniels' general factual questions about Ethiopia were not personal to Ayalew and were unrelated to the offense, so that they could not reasonably be expected to elicit an incriminating response regarding Ayalew's alleged crossing of the border. See Miller, 382 F. Supp. 2d at 370 ("The questions must have been both likely to elicit an incriminating response and to produce psychological pressures that will subject the individual to the 'will' of the examiner.") (internal quotations omitted). Because the conversation about Ethiopia does not constitute interrogation, Ayalew's rights were not violated and his Motion to suppress the statements made to Agent Daniels after the arrest is denied.

C.   Search of camera

Defendant argues that the search of the camera was improper either as fruit of the poisonous tree stemming from an illegal arrest, or because the search exceeded the scope and purpose of a search incident to arrest. Defendant additionally notes that because he was separated from his bag and camera before their search, he was unable to gain access to them. Defendant does not challenge Agent Daniels' removal of the camera before the arrest.[2]

---

[2] Even if Defendant challenged the seizure of the camera prior to arrest, that argument would fail because Daniels had probable cause to arrest Ayalew based on the available information. The seizure of the camera and bag was thus proper to preserve evidence and/or to ensure Agent Daniels' safety. See, e.g., United States v. Wilson, 94 Fed. Appx. 14, 17 (2d Cir. 2004) ("Once probable cause was established, it is irrelevant whether the officers' search of Wilson occurred prior or subsequent to his arrest"); United States v. Riggs, 474 F.2d 699, 704 (2d Cir. 1973), cert. denied, 414 U.S. 820 (1973) ("postponement of the further intrusion of arrest does not remove the justification for the search and in no way prejudices the individual's Fourth Amendment rights").

However, the cases cited by Defendant are not on point. In <u>Chimel v. California</u>, the Supreme Court indeed limited the scope of a search incident to an arrest, where the police had searched the defendant's entire house incident to the arrest. 395 U.S. 752, 673 (1969). However, this case presents a different situation, and one also dealt with by the Supreme Court. In <u>United States v. Edwards</u>, the Court upheld a warrantless search and seizure of the defendant's clothing while he was in jail, as well as the subsequent search of his clothing and a closer examination of money from his seized wallet, despite the fact that the property was being held in the property room, and thus was in no risk of being destroyed or posing any danger to the officers. 415 U.S. 800, 807 (1974) ("a search warrant to again look at the money already in police custody does not make sense").

In this case, once Ayalew's camera was lawfully taken from him, he could no longer expect any right of privacy with respect to the contents of the camera. See <u>Katz v. United States</u>, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Agent Tatro did not violate any expectation of privacy or violate any of Defendant's rights when he examined the camera's contents to look for evidence. Accordingly, Defendant's Motion to suppress the photographs is denied.

D.     Statements made to Agent Torres

It is uncontested that Ayalew invoked his right to remain silent and to speak to a lawyer on November 5, 2007. Agent Tatro testified that later that night, as well as the next day, Ayalew made several statements to him. Defendants seek to suppress all of the statements as following an illegal arrest or as made in violation of Ayalew's <u>Miranda</u> rights.

11

       1.      Statement made on November 5, 2007

Agent Tatro testified that on the night of November 5, 2007, at the station, Ayalew stated that he couldn't believe they arrested him "for crossing that magic line" while shuffling his feet. Tatro Test. at 24 (Dkt. No. 24). Agent Tatro testified that he did not ask Ayalew any questions at the station after he invoked his Miranda rights. Id. at 22. Accordingly, this statement was not made in response to any interrogation by Agent Tatro. The Second Circuit has long held that "incriminatory statements were admissible without the necessity of finding a Miranda waiver where it was found that such admissions were 'spontaneous'". United States v. Vigo, 487 F.2d 295, 300 (2d Cir. 1973); United States v. Miller, 382 F. Supp. 2d at 370 ("Nothing in the Fifth Amendment prohibits the police from merely listening to volunteered statements, and then using those statements at trial."). Accordingly, because this statement was "not the product of interrogation but was simply a spontaneous utterance volunteered by the defendant," Vigo, 487 F.2d at 300, the statement is admissible and the Motion to suppress it is denied. See also Miranda v. Arizona, 384 U.S. 436, 478 (1966) ("Volunteered statements of any kind are not barred by the Fifth Amendment").

       2.      Statements made on November 6, 2007

The following day, while Agent Tatro transported Ayalew to the Magistrate Judge's office, a conversation ensued and Ayalew made several statements in response to statements made by Agent Tatro. Although the order of the statements is not completely clear, Agent Tatro testified that Ayalew's statement regarding "crossing that magic line" followed his explanation to Ayalew of "what was going on, the purpose of the trip, where [they] were going." Id. at 24-25.

12

That statement, as well as Ayalew's statement that he is not a terrorist, also apparently followed Agent Tatro's statement to Ayalew that the Border Patrol is "looking for terrorists and or drugs or contraband crossing the border." Id. at 29 (Agent Tatro also asked Ayalew if he could describe what a terrorist looked like). Even after these statements, Agent Tatro continued speaking to Ayalew, explaining to him that he was ordered deported and what was going to happen, and adding "that's what you want a lawyer to -- if you fear for your life, going back to your country, you have a lawyer to represent you." Id. at 26-27.

The Supreme Court has refined the definition of "interrogation" for Miranda warning purposes to include "not only . . . express questioning, but also . . . any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnotes omitted); see id. at 300-01 (defining interrogation as "either express questioning or its functional equivalent").

The Court finds that Agent Tatro, in telling Ayalew what crimes the Border Patrol was looking for and asking him to describe a terrorist, should have known that the conversation "was reasonably likely to elicit an incriminating response" from Ayalew. Innis, 446 U.S. at 302. Unlike the setting of the previous night, when Ayalew had just asserted his Miranda rights and Agent Tatro did not ask him any questions, here Agent Tatro apparently initiated the conversation with Ayalew, who was shackled and being transported to appear in front of a Magistrate Judge. Agent Tatro should have known that a discussion about border-related crimes and Ayalew's specific legal situation was likely to elicit an incriminating response from him.

13

Accordingly, the statements that Ayalew made to Agent Tatro during the transport on November 6, 2007 were made without a waiver of Ayalew's Miranda rights and must be suppressed. The Motion to suppress is hereby granted with respect to these statements.

### III. Conclusion

Accordingly, it is hereby

**ORDERED**, that Defendant's Motion to Suppress is DENIED as to the statements made to Agent Daniels, the photographs recovered from his digital camera, and the statement made on November 5, 2007 to Agent Torres; and it is further

**ORDERED**, that Defendant's Motion to Suppress is GRANTED as to the statements made on November 6, 2007 to Agent Torres; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED.**

DATED:      June 20, 2008
            Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge